UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN IRON BOULDER,<br><br>Defendant. | 3:15-CR-30032-RAL<br><br>OPINION AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE |

After serving less than 9 years of an 18-year sentence for the attempted murder of a federal employee, Brian Iron Boulder seeks compassionate release based on a combination of factors, including health conditions, COVID-19, and being a victim of sexual abuse, which he argues constitutes an extraordinary and compelling reason to reduce his sentence. Doc. 51. For the reasons explained, this Court denies his motion.

I.  **Facts Background**

Iron Boulder pleaded guilty to the attempted murder of a federal employee under 18 U.S.C. § 1114. Docs. 24, 25, 34 ¶ 3. The plea agreement's factual basis statement sets forth that on or about March 25, 2015, Iron Boulder went to the Crow Creek Agency building in Fort Thompson, South Dakota, and requested a meeting with Patrick F. Duffy, the Bureau of Indian Affairs Superintendent for the Crow Creek Agency. Doc. 25 at 2. Iron Boulder had met with Duffy on prior occasions about his girlfriend's land/lease holdings within the Crow Creek Reservation. Id. But Duffy refused to discuss those details with Iron Boulder without her being present or signing a waiver/consent form. Doc. 34 ¶ 8.

1

Iron Boulder was intoxicated, angry, and carried with him a pocketknife with a 4-inch blade. Id. ¶ 9; Doc. 25 at 2. When he arrived at the Crow Creek Agency building, Duffy was in another meeting, but agreed to speak with Iron Boulder anyway. Doc. 25 at 2. Duffy guided Iron Boulder, who followed a few steps behind, down a hallway toward his office. Id.; Doc. 34 ¶ 9. Iron Boulder, who had intentionally extended the knife's 4-inch blade upon entering the building, drove the blade into Duffy's back. Doc. 25 at 2. Iron Boulder then fled, leaving one of Duffy's co-workers to find him lying in the fetal position with the knife protruding from this back. Doc. 34 ¶ 9. Emergency medical personnel transported Duffy to the Chamberlain hospital, and a flight team air lifted him to Sanford Hospital in Sioux Falls, where he remained until March 31, 2015. Id. ¶ 6.

Duffy suffered life-threatening injuries. Doc. 25 at 3. The knife entered Duffy's upper back medial to his left scapula and penetrated his chest wall, leading to bleeding in Duffy's plural cavity, requiring a chest tube. Id. Two weeks after being discharged, Duffy was again hospitalized and underwent a second operation to fix a collapsed lung. Id. at 3; Doc. 34 ¶ 12. Almost six months after being stabbed, Duffy still attended bi-weekly doctor appointments. Doc. 34 ¶ 13. The attack left him in permanently weaker condition; long after the offense, he continued to suffer from diminished lung capacity and low stamina. Id.

On September 14, 2015, this Court sentenced Iron Boulder to 216 months of imprisonment and 3 years supervised release. Doc. 40. At the time this Opinion and Order was drafted, Iron Boulder is serving his sentence at USP Coleman II, a high security federal prison in Sumter County, Florida. (https://www.bop.gov/inmateloc/ (Federal Register No.: 06154-073)). He is scheduled to be released on June 16, 2031. Id.

On March 7, 2023, Iron Boulder applied for compassionate release through the Bureau of Prisons (BOP). Doc. 46-1 at 2. The BOP denied his request on April 26, 2023. Id. at 1. On June 9, 2023, Iron Boulder filed with this Court a pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Doc. 46. This Court appointed Iron Boulder counsel, who supplemented his motion. Doc. 51. The United States opposes Iron Boulder's request. Doc. 54.

**II.   Legal Standard**

Sentences are final judgments, and under ordinary circumstances, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); see also United States v. Olson, No. 3:19-CR-30133-RAL, 2021 WL 4478031, at *1 (D.S.D. Sept. 30, 2021). However, 18 U.S.C. § 3582(c)(1)(A) provides an exception to this general rule. Section 3582(c)(1)(A), as amended by the First Step Act, allows district courts to hear and decide motions for a reduced sentence filed by prisoners themselves, so long as the prisoner exhausted all administrative rights to appeal the BOP's failure to file a motion on the prisoner's behalf, or after 30 days have passed from the receipt of such a request by the warden of the prisoner's facility, whichever is earlier. Here, Iron Boulder in March 2023 submitted his administrative request for compassionate release to the warden of his facility, who subsequently denied his request. Doc. 46-1. Iron Boulder has exhausted his administrative remedies,[1] and his motion is ripe for review.

---

[1] The Eighth Circuit has held that § 3582(c)(1)(A)'s exhaustion requirement is non-jurisdictional but serves as a "mandatory claim-processing rule" that must be enforced if raised by the opposing party. United States v. Houck, 2 F.4th 1082, 1084 (8th Cir. 2021). The United States agrees Iron Boulder exhausted his administrative remedies and does not raise any failure to exhaust argument. Docs. 49 at 1, 54 at 2. This Court, therefore, proceeds to review Iron Boulder's motion on its merits.

3

Under § 3582(c)(1)(A), a district court may grant a prisoner's motion for a reduced sentence after (1) the court finds that extraordinary and compelling reasons exist,[2] (2) those reasons are consistent with the applicable policy statement promulgated by the United States Sentencing Commission, here § 1B1.13; and (3) an examination of the § 3553(a) sentencing factors supports a sentence reduction. § 3582(c)(1)(A)(i)–(ii). Congress did not define "extraordinary and compelling reasons." See 28 U.S.C. § 994(t). Instead, Congress charged the Sentencing Commission with issuing general policy statements outlining the "appropriate use of . . . the sentence modification provisions set forth in section[] . . . 3582(c)," including "what should be considered extraordinary and compelling reasons for sentence reduction [and] the criteria to be applied." § 994(a)(2)(c), (t). Effective November 1, 2023, the Sentencing Commission updated the criteria for what constitutes "[e]xtraordinary and compelling reason[s]" to reduce a term of imprisonment. U.S.S.G. § 1B1.13(b). As amended, "extraordinary and compelling reasons exist under any of the following circumstances or [through] a combination thereof": (1) medical circumstances of the defendant, (2) age of the defendant, (3) family circumstances of the defendant, (4) being a victim of sexual or physical abuse while in custody, (5) other reasons with equal gravity as the aforementioned circumstances, and (6) unusually long sentences. A "district court has broad discretion in determining whether proffered circumstances warrant" compassionate release under the First Step Act. United States v. Loggins, 966 F.3d 891, 893 (8th Cir. 2020).

---

[2] A court could also grant a reduced sentence if the defendant is at least 70 years old and has served at least 30 years in prison, see § 3582(c)(1)(A)(ii), but Iron Boulder fulfills neither of those requirements, so the Court confines its analysis to the extraordinary and compelling reasons exception under § 3582(c)(1)(A)(ii).

4

III. **Discussion**

A. **Extraordinary and Compelling Reasons**

Iron Boulder presents two main arguments for the presence of extraordinary and compelling reasons. First, he argues that he suffers various medical conditions not being adequately treated that increase both the risk of him being unable to care for himself in a custodial setting and his risk of serious illness if he contracts COVID-19. Second, Iron Boulder argues that his medical conditions together with being a victim of sexual abuse constitutes an extraordinary and compelling circumstance warranting a sentence reduction. This Court addresses each argument in turn.

1. **Medical Circumstances of the Defendant**

Iron Boulder has some legitimate health concerns. He is 59 years old and has a Body Mass Index of 34.3, Doc. 48 at 81, which puts him well into the obese category.[3] His medical history references age-related cataracts, anemia, asthma, cellulitis, deep vein thrombosis (DVT), dermatitis, dermatophytosis, edema, hypermetropia, hypertension, insufficient vein disorder, muscle injury, latent tuberculosis infection, opioid use disorder, osteoarthritis, polyarthritis, prediabetes, presbyopia, spinal fusion, and vitamin D deficiency. Doc. 48 at 224–27. To manage these conditions, Iron Boulder has been prescribed albuterol (asthma), cholecalciferol (vitamin D deficiency), clobetasol (dermatitis), clindamycin (cellulitis), lisinopril (hypertension), ferrous gluconate (iron deficiency), furosemide and potassium chloride (edema), and Eliquis (DVT). Id.

In determining whether these medical conditions constitute an extraordinary and compelling reason to reduce a defendant's sentence, this Court takes guidance from the Sentencing

---

[3] Nat. Heart, Lung, and Blood Inst. https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited Jan. 2, 2024).

5

Commission's policy statement in § 1B1.13(b)(1). Within this policy statement, the Sentencing Commission identified specific criteria for when a defendant's medical circumstances constitute an extraordinary and compelling reason to reduce his or her sentence:

> (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> (B) The defendant is—
>     (i) suffering from a serious physical or medical condition,
>     (ii) suffering from a serious functional or cognitive impairment, or
>     (iii) experiencing deteriorating physical or mental health because of the aging process,
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
> (D) The defendant presents the following circumstances—
>     (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>     (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and
>     (iii) such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13(b)(1). Iron Boulder does not argue, nor would the evidence support, that he suffers from a terminal illness, therefore, his argument implicates subsections (B), (C), and (D) only.

### a. Section 1B1.13(b)(1)(B)

An extraordinary and compelling reason for compassionate release exists under § 1B1.13(b)(1)(B) when an inmate suffers from a serious physical or medical condition, a serious functional or cognitive impairment, or age-related mental or physical deterioration that he is not

6

expected to recover from and that substantially diminishes his ability to provide self-care within a custodial environment. Iron Boulder suffers from no such condition.

Iron Boulder's most serious medical condition appears to be venous stasis ulcers secondary to chronic venous insufficiency (CVI). His medical records indicate that he began suffering from leg ulcers around December 2022, and those ulcers continued to torment him through at least October 2023. Doc. 48 at 349. The BOP has been treating these ulcers through a variety of methods, including antibiotics, medicinal ointments, bandages, and compression. They also instructed Iron Boulder to make lifestyle changes (diet and exercise) that would improve his health and facilitate healing.[4] Id. at 145

As Iron Boulder's records show, his healing process has been slow and not without obstacles. In March 2023, Iron Boulder's ulcers became infected with methicillin resistant staphylococcus aureus (MRSA), which required two cycles of antibiotics to treat successfully. A month later, Iron Boulder went to the emergency department for leg pain that accompanied his leg ulcers.[5] Doc. 48 at 349. The hospital care team diagnosed him with bilateral DVT, cellulitis,

---

[4] Lifestyle changes are often one of the first treatment options that health care providers recommend. Chronic Venous Insufficiency, Cleveland Clinic (July 17, 2022), https://my.clevelandclinic.org/health/diseases/16872-chronic-venous-insufficiency-cvi.

[5] Iron Boulder claims that he was admitted to the hospital because he was experiencing septicemia, Doc. 51 at 6, but his medical records do not support this claim. All records indicate that he was sent to the hospital to "r/o" or rule out septicemia as a diagnosis. Doc. 48 at 81, 82, 116, 117. The hospital's subsequent diagnosis did not include septicemia as one of Iron Boulder's conditions. Compare id. at 81 with id. at 308.

7

chronic venous insufficiency[6], and "likely venous stasis ulcers."[7] Id. at 354, 367. The hospital also provided a consultation with a wound care specialist who recommended a treatment plan nearly identical to the course of treatment the BOP had implemented. Compare Doc. 48 at 140, 141, 145, 147, 168 with 414. The continued adherence to this treatment plan has proven fruitful; Iron Boulder's ulcers are gradually healing. Id. at 3, 5, 7, 10, 22, 32, 34, 45, 66, 90, 107, 138, 638.

Additionally, Iron Boulder has not demonstrated how his current medical conditions substantially diminish his ability to provide self-care. Rather, quite the opposite seems true. Treating DVI and venous ulcers requires significant patient involvement, including daily wound care, strict hygiene, leg elevation, exercise, and weight management. Nothing in the record indicates that Iron Boulder is physically or mentally incapable of caring for himself in these ways, let alone not being able to complete the more mundane tasks associated with daily living. See United States v. Korn, No. 15-CR-81S, 11-CR-384S, 2020 WL 1808213, at *5 (W.D.N.Y. Apr. 9, 2020) (denying compassionate release to a defendant who could complete self-care activities associated with daily living, like getting dressed, bathing, eating, and being independent mobile, albeit with a cane). Accordingly, Iron Boulder's medical circumstances do not constitute an extraordinary and compelling reason for a sentence reduction under § 1B1.13(b)(1)(B).

---

[6] Chronic venous insufficiency (CVI) occurs when the veins in one's legs become damaged. The damaged veins cannot not properly regulate blood flow, so the blood that should flow back up towards the heart ends up flowing backwards and pooling in the patient's legs. Chronic Venous Insufficiency, supra note 4. Common symptoms or side effects of CVI are open leg ulcers that can be difficult to treat and edema. Id.; see also Chronic Venous Insufficiency, John Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/chronic-venous-insufficiency (last visited Jan. 2, 2024).

[7] Venous stasis ulcers are wounds caused by lower extremity vein and blood flow issues that "can take several months to heal." Venous Ulcer, Cleveland Clinic (May 26, 2022), https://my.clevelandclinic.org/health/diseases/23165-venous-ulcer.

b. **Section 1B1.13(b)(1)(C)**

To prove an extraordinary and compelling reason for a sentence reduction under § 1B1.13(b)(1)(C), an inmate must show that he is suffering from a "medical condition that requires long-term or specialized medical care that is not being provided and without which the [inmate] is at risk of serious deterioration in health or death." Insufficient vein disorder and chronic venous ulcers are both medical conditions that require long-term medical care and, if ignored, can lead to a serious deterioration in one's health.[8] In very severe cases a patient may lose a limb from severe infection such as gangrene.[9] However, in most cases, chronic venous insufficiency "isn't life-threatening and doesn't require amputation."[10] "With [proper] treatment, people with venous stasis ulcers can make a full recovery."[11]

Iron Boulder has not demonstrated that the BOP is not or cannot adequately address his medical needs. Based on his medical records, Iron Boulder is receiving frequent and thorough medical attention for his wounds. And the BOP's treatment aligns with the treatment plan recommended by a wound care specialist at the University of Florida Health. While this Court understands Iron Boulder's frustration with the prolonged period he has suffered from these ulcers, a protracted healing time appears to be characteristic of the condition itself, not an indication of inadequate medical care.

Iron Boulder appears to bear some responsibility for the lengthy healing period. Care providers counseled him several times about making healthy lifestyle changes to support his

---

[8] See, e.g., Chronic Venous Insufficiency, John Hopkins Med., supra note 6 (explaining CVI cannot be cured and must be proactively managed); Venous Ulcer, supra note 7 (explaining that venous stasis ulcers are slow to heal and do not heal without treatment).
[9] Venous Ulcer, supra note 7.
[10] Chronic Venous Insufficiency, supra note 4.
[11] Venous Ulcer, supra note 7.

9

healing,[12] but he has failed to implement that advice. Doc. 48 at 13, 26, 63, 133, 145, 170, 173, 177, 207, 208, 211, 212. Iron Boulder has not managed to reduce his weight to a healthy BMI. See Id. at 2, 81, 163, 286. And when told to make heart healthy dietary changes, such as cutting back on his sodium intake, Iron Boulder continued to consume salty potato chips and soups. Doc. 48 at 63, 69.

On these facts, Iron Boulder's medical conditions do not constitute an extraordinary and compelling reason under § 1B1.13(b)(1)(C). The record indicates Iron Boulder has received appropriate treatment for all his medical conditions. See Doc. 48. And he has not demonstrated how a reduced sentence would allow him to receive more specialized or effective medical care than what he is receiving in custody.

### c. COVID-19 and Section 1B1.13(b)(1)(D)

Iron Boulder next argues that his medical conditions put him at an increased risk of becoming severely ill with COVID-19 and suffering serious medical complications. The Sentencing Commission's revised policy statement provides that an extraordinary and compelling reason exists when the inmate is incarcerated at a correctional facility that is presently "affected or is at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing, public health emergency" as declared by the appropriate governmental authority; the inmate has personal risk factors that put him at an increased risk of death or severe medical complications if exposed; and the inmate's increased "risk cannot be adequately mitigated in a timely manner." U.S.S.G. § 1B1.13(b)(1)(D)(i)–(iii).

---

[12] "While you're undergoing treatment, there are steps you can take to promote healing. These steps include: Eating a healthy diet, which supports your body's natural healing abilities." Venous Ulcer, supra note 7. Exercise and weight management are usually one of the first methods of treatment that health care providers recommend. Chronic Venous Insufficiency, supra note 4 ("Extra weight can put pressure on [one's] veins and damage the valves.").

First, COVID-19 is no longer the sort of ongoing public health emergency that it once was. Alexander Tin, Biden Says COVID-19 Pandemic is "Over" in U.S., CBS NEWS (Sept. 19, 2022); Pub. L. No. 118-3, 137 Stat. 6 (2023). The public health emergency for COVID-19 officially expired in May 2023, though it still remains a health concern particularly for the unvaccinated or those with immunodeficiencies.[13] Second, USP Coleman II (where Iron Boulder is currently incarcerated) is not presently affected by or at imminent risk of being affected by an ongoing COVID-19 outbreak. At the time this opinion and order was written, USP Coleman II is at operation level 1,[14] meaning the medical isolation rate is less than 2% and new positive cases are fewer than 100 per 100,000 over the last 7 days.[15] COX, Coleman II's parent complex, has 2 active COVID-19 cases among 6,332 inmates—4,226 of which are fully inoculated against COVID-19.[16] USP Coleman II itself has zero active inmate cases and only one active case among its staff.[17]

Because Iron Boulder suffers from hypertension, asthma, prediabetes, and obesity, he has an increased risk for severe COVID-19.[18] Still, his risk of serious illness and death can be

---

[13] Assistant Sec'y for Pub. Affs., COVID-19 Public Health Emergency, U.S. Dep't Health and Hum. Servs., https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html (last visited Jan. 2, 2024).
[14] USP Coleman II, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/clp/ (last visited Jan. 2, 2024).
[15] COVID-19 Modified Operations Plan & Matrix, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Jan. 2, 2024).
[16] Inmate COVID-19 Data, Fed. Bureau of Prisons, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last visited Jan. 2, 2024).
[17] BOP COVID-19 Statistics, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_statistics.html (last visited Jan. 2, 2024).
[18] Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals, Ctrs. for Disease Control and Prevention (Feb. 9, 2023), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html.

"adequately mitigated in a timely manner" through inoculation.[19] COVID-19 vaccines are a safe and effective way to reduce the risk of serious illness or death associated with COVID-19. See United States v. Lara, No. 3:16-CR-30160-RAL, 2021 WL 1207875, *3 (D.S.D. March 30, 2021) (stating that defendant's "risk of severe illness from COVID-19 is exceedingly low" after being fully inoculated); United States v. Hammond, No. 8:07CR213, 2022 WL 16748655, at *2 (D. Neb. Nov. 7, 2022) (recognizing that COVID-19 vaccines are effective at mitigating the risk of severe illness, "even for those with [pre]-existing health complications"); United States v. Chau, No. 4:20-CR-350-JAR, 2022 WL 17358421, at *2 (E.D. Mo. Dec. 1, 2022) (acknowledging that courts regularly find that vaccination "significantly reduces or eliminates the risk of severe illness from [COVID-19]").

Iron Boulder's medical records suggest that he received the COVID-19 vaccine in 2021 but has not received one since. Doc. 56 at 5; see Doc. 48 at 235 (most recent BOP immunization record not showing COVID-19 vaccination). The BOP has COVID-19 vaccines and boosters available for all staff and inmates.[20] Iron Boulder can decide whether he receives an updated vaccination and mitigates the risks associated with COVID-19, or not. In any event, his decision to forgo a booster does not alter this Court's analysis; section 1B1.13(b)(1)(D) is written in the conjunctive. An extraordinary and compelling reason exists under § 1B1.13(b)(1)(D) only when the defendant's "risk cannot be adequately mitigated in a timely manner." Given the efficacy and

---

[19] Benefits of Getting a COVID-19 Vaccine, Ctrs. for Disease Control and Prevention (Sept. 22, 2023), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (Vaccination remains the safest strategy for avoiding hospitalization, long-term health outcomes, and death); COVID-19 Vaccine Effectiveness, Ctrs. for Disease Control and Prevention (Dec. 14, 2023), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html.
[20] A BOP COVID-19 Overview, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/overview.jsp#:~:text=The%20BOP%20is%20also%20working,and%20inmates%20when%20clinically%20indicated (last visited Jan. 2, 2024).

availability of vaccinations in the BOP system, the risks associated with COVID-19 can be timely mitigated.

In short, although Iron Boulder has personal risk factors that increase his risk of death or severe illness from COVID-19, he is unable to show that his risk cannot be adequately and timely mitigated, nor can he show that Coleman II is affected or at imminent risk of being affected by an ongoing COVID-19 outbreak. Thus, Iron Boulder has failed to show two out of the three elements needed to establish an extraordinary and compelling reason under § 1B1.13(b)(1)(D).

### 2. Victim of Abuse and Other Reasons

Iron Boulder claims he was the victim of sexual abuse while incarcerated. Doc. 51 at 3. As amended, § 1B1.13(b)(4) recognizes that an extraordinary and compelling reason may exist to reduce an inmate's sentence when the inmate has been the victim of sexual or physical abuse while incarcerated if the abuse was "committed by, or at the direction of, a correctional officer, an employee or contractor of the [BOP], or any other individual who had custody or control over the defendant." The policy statement further requires that the abuse be established through a criminal, civil, or administrative proceeding, "unless such proceedings are unduly delayed or the defendant is in imminent danger." U.S.S.G. 1B1.13(b)(4). Iron Boulder acknowledges that he is not able to satisfy the above criteria. See Doc. 51 at 7. Instead, he argues that § 1B1.13(b)(4) serves as an indication that sexual abuse in prison can have negative effects on the victim, which undoubtedly is true. He therefore asserts that his own history of sexual abuse together with his medical conditions should be considered an extraordinary and compelling reason to reduce his sentence. Doc. 51 at 7. Iron Boulder's contention of being subject to sexual abuse, while disconcerting, is an allegation at this point and thus does not merit a sentence reduction.

13

Under § 1B1.13(b)(5), the sentencing commission provided a catch-all provision allowing courts to find extraordinary and compelling reasons to a reduce a sentence when "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." This Court has fully considered all of Iron Boulder's alleged extraordinary and compelling grounds for release individually. This Court also has considered these alleged reasons together and finds, even in combination with one another, they do not meet the standards articulated in § 1B1.13(b)(1)–(4). No extraordinary and compelling reasons exist to reduce Iron Boulder's sentence.

**B. Section 3553(a) Sentencing Factors and Danger to Community**

Although a court need not consider the § 3553(a) factors when there are no extraordinary or compelling reasons to reduce a sentence, United States v. Brown, No. 4:18-CR-40138–LLP, 2023 U.S. Dist. Lexis 83723, *12 (D.S.D. May 9, 2023), a review of the § 3553(a) factors weighs against granting compassionate release to Iron Boulder. The § 3553(a) sentencing factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Sentencing Commission] guidelines . . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a). These factors inform the Court's duty to ensure the sentence imposed is "'sufficient, but not greater than necessary,' to comply with the sentencing purposes set forth in § 3553(a)[]." Pepper v. United States, 562 U.S. 476, 491 (2011).

### 1.    Nature and Circumstances of the Offense

This Court first calculates the advisory guideline range and then considers the nature and circumstances of the offense. This Court ultimately agreed with the parties' plea agreement and sentenced Iron Boulder under the guideline range of 188 to 235 months calculated using a base offense level for attempted second-degree murder. See Doc. 53 at 30, 33–34. Yet, this Court noted during the sentencing hearing and underscores now that the offense has characteristics of premeditation and deliberation. Id. at 34. The attempted murder of another person is always a grave offense. As detailed above, intoxicated and fueled by animus, Iron Boulder walked into the BIA Office in Fort Thompson with the blade of his pocketknife extended and stabbed Superintendent Duffy in the back. Doc. 34 ¶ 6. The attack left Duffy with life-threatening injuries. Id. Given the severity of Iron Boulder's offense, the need to provide just punishment weighs against a reduced sentence below the 18-year sentence imposed.

### 2.    History and Characteristics of the Defendant

This Court next looks at the history and characteristics of the defendant. Iron Boulder argues that his history of physical abuse and personal struggles with alcoholism, the negative effect it has had on his life, and its role in this case supports a reduction in his sentence. Doc. 51 at 9. When sentencing Iron Boulder, this Court was acutely aware of his past physical abuse and his struggle with sobriety. The presentence investigation report thoroughly discussed Iron Boulder's personal and family history. Doc. 34 ¶¶ 53–57. Iron Boulder's attorney mentioned in argument the abuse Iron Boulder suffered as a child. Doc. 53 at 25. And when articulating its reasoning

before imposing the sentence, this Court referenced Iron Boulder's "very difficult upbringing" when it considered his personal history and characteristics. Id. at 33. The circumstances of Iron Boulder's upbringing of course have not changed since his sentencing, and he has not presented any novel information that would change the analysis of his history and characteristics. Having already considered these matters when imposing the original sentence and after re-considering them now, this Court believes its original sentence appropriate.

3.     **Deterrence, Protection of the Public, and Rehabilitation**

A sentencing judge must also consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment, as well as the need to protect the public from further crimes of the defendant and to afford adequate deterrence. § 3553(a)(2)(A)–(C). A review of Iron Boulder's prison disciplinary record illustrates that a reduced sentence would not protect the public or afford adequate deterrence. Iron Boulder has amassed quite the record of dangerous misconduct while in prison. Doc. 48 at 440–49. He has received five violations for possession of a dangerous weapon, including a "shank" with a five-inch blade, homemade razor blades, and on one occasion, four homemade "shanks" on his person. Id. He has threatened to physically harm prison staff four times and has perpetrated a physical assault on a correctional officer at least once; he also has assaulted a fellow inmate. Id. Iron Boulder has two violations for defecating within his cell, smearing feces on himself, and threatening to do the same to prison staff. Id.

Iron Boulder's misconduct in prison shows a continued lack of respect for rules, as well as the safety and welfare of others. This behavior does not demonstrate rehabilitation. Rather, it reinforces the need for Iron Boulder to remain incarcerated at this time. Considering these factors,

this Court believes that its original sentence remains appropriate to achieve the purposes of punishment, deterrence, rehabilitation, and the need to protect the public.

### 4. Remaining § 3553(a) Factors

After thoroughly reviewing the record of this case in light of the remaining § 3553(a) factors, including the kinds of sentences available, the need to avoid unwarranted sentencing disparities, and the need to provide educational, vocational, or correctional treatment in the most effective manner, this Court concludes that these factors are not served by a reduced sentence.

### C. COVID-19 as Additional Punishment

Lastly, Iron Boulder argues that the experience of being incarcerated during the COVID-19 pandemic constitutes additional punishment and should be accounted for in determining whether the time he has served satisfies the sentencing goals articulated in the § 3553(a) factors. He asserts that "the pandemic affected general institutional operations and impacted inmate mental, emotional, and physical well-being." Doc. 51 at 9. While that may be true, these abnormal conditions do not constitute "additional punishment" warranting a reduction in his original sentence.

The BOP altered institutional operations to mitigate the spread of COVID-19 within prison facilities. The change in conditions resulted from BOP mitigation polices that were in accord with Centers for Disease Control guidelines and reflected a reasonable response to the threat posed by the virus. The conditions were not altered or tailored to achieve the goals of sentencing, nor were the conditions imposed on some inmates and not others. See United States v. Barth, No. 16-cr-143-JD, 2020 U.S. Dist. Lexis 227349, *9–10 (D.N.H. Dec. 3, 2020) (conditions of confinement were not unique to the defendant because they were "imposed generally for the safety of inmates and staff [during] the pandemic").

Moreover, even if the change in prison conditions mattered in applying the § 3553(a) factors, that would make no difference in the absence of an extraordinary and compelling reason to reduce Iron Boulder's sentence. Although some courts did grant compassionate release based on the conditions of incarceration during the height of the COVID-19 pandemic, those courts did so based on the conditions of incarceration being an extraordinary and compelling reason, not as part of the § 3553(a) analysis.[21] And these decisions predate the Sentencing Commission's amendment of § 1B1.13 and the declared end of the pandemic. See United States v. Livesay, No. 3:18-CR-36-TAV-DCP-15, 2023 U.S. Dist. Lexis 208526, *26–27 (E.D. Tenn., Nov. 21, 2023) (finding that prison lockdown conditions during COVID-19 do not constitute extraordinary and compelling grounds comparable in gravity to those reasons listed in § 1B1.13(b)(1)–(4)). Furthermore, it is axiomatic that the conditions of COVID-19 are not "extraordinary" as to this defendant when inmates at Coleman II and other prison facilities throughout the country all faced substantially similar conditions to abate the spread of COVID-19. Extraordinary and compelling circumstances require an individual inquiry, not the existence of a worldwide pandemic. United States v. Marcussen, 15 F.4th 855, 858 (8th Cir. 2021). Compassionate release remains a "narrow path" to release. See United States v. Shields, No. 3:07-CR-30106-KES, 2021 WL 765001, at *1 (D.S.D. Feb. 26, 2021). It is not a doorway for the widespread release of inmates based solely on communal exposure to harsher than normal conditions of confinement. See Marcussen, 15 F.4th at 858.

---

[21] See, e.g., United States v. Robles, 553 F. Supp. 3d 172, 183 (S.D.N.Y. Aug. 10, 2021) (finding that the conditions of incarceration during COVID-19 was additional punishment when compared to prison sentences of co-defendants released before COVID-19).

18

## IV. Conclusion and Order

No extraordinary and compelling reasons exist to grant Brian Iron Boulder's motion for compassionate release at this time, and even if such reasons did exist, the § 3553(a) factors counsel against a reduction in his sentence. Therefore, it is hereby

ORDERED that the Motion for Compassionate Release, Doc. 46, is denied.

DATED this 16th day of January, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE